# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

CHERYLL GRAHAM,

        **Plaintiff,**

   **v.**

LIFE INSURANCE COMPANY OF
NORTH AMERICA,

        **Defendant.**

**1:15-cv-3240-WSD**

## OPINION AND ORDER

This matter is before the Court on Defendant Life Insurance Company of North America's ("Defendant") Motion for Judgment on the Administrative Record [12] ("Motion").

## I. BACKGROUND

Plaintiff in this action seeks review, under the Employee Retirement Income Security Act of 1974 ("ERISA"), of Defendant's denial of long term disability ("LTD") benefits. Plaintiff was a registered nurse at DeKalb Regional Health System ("DeKalb Regional"), and was enrolled in the DeKalb Medical Welfare Plan (the "Plan"). On July 9, 2012, Plaintiff had a total abdominal hysterectomy. After the procedure she began to suffer severe pain, causing her, she claims, to be

totally disabled.  Plaintiff challenges Defendant's administrative determination that she was not entitled to receive LTD benefits.

    A.    <u>The LTD Plan</u>

DeKalb Medical is the Plan Administrator, and appointed Defendant as the Plan's claims administrator and administrator of LTD benefits claims.  ([12.1]).  LTD Plan benefits are funded by Group Policy Number LK-980121 ("Group Policy") and are payable under the Plan based on Defendant's application of the Plan's terms.  (Admin. R. [12.3-12.6] ("R.") 6-29).  The Appointment of Claim Fiduciary delegates to Defendant responsibility "for adjudicating claims for benefits under the Plan, and for deciding any appeals of adverse claim determinations."  ([12.2]).  Defendant has "the authority, in its discretion, to interpret the terms of the Plan, including the Policies; to decide questions of eligibility for coverage or benefits under the Plan; and to make any related findings of fact."  (<u>Id.</u>).

The Group Policy provides:

**Disability Benefits**
The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. . . .  He or she must provide the Insurance Company, at his or her expense, satisfactory proof of Disability before benefits will be paid.

(R. 14).  The Group Policy defines "disability" as follows:

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
>
> 1. unable to perform the material duties of his or her Regular Occupation and
>
> 2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.
>
> After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
>
> 1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
>
> 2. unable to earn 60% or more of his or her Indexed Earnings.

(R. 9).  The Group Policy defines "Regular Occupation" as:

> The occupation the Employee routinely performs at the time the Disability begins.  In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy.  It is not work tasks that are performed for a specific employer or at a specific location.

(R. 25).

### B.    Initial Treatment and Administrative Review

Plaintiff worked as a registered nurse with DeKalb Regional for over eight years.  (R. 327).  A registered nurse is a medium level occupation that requires exerting up to 20 to 50 pounds of force occasionally, or 10 to 25 pounds of force

frequently, or greater than negligible up to 10 pounds of force constantly to move objects.  (R. 177).

On July 9, 2012, Plaintiff had a total abdominal hysterectomy.  (R. 321-22).  On September 6, 2012, during a follow-up visit with her gynecologist, Dr. Pamela J. Brown, Plaintiff did not report any pain.  (R. 321-24).  Plaintiff returned to work.  On September 14, 2012, while walking down a hallway at work, she experienced severe pain in her back, pressure in her pelvis, and weakness to both legs.  (R. 325).  Plaintiff's last day of work was September 15, 2012.  (R. 32).

On September 17, 2012, Plaintiff returned to Dr. Brown, complaining of lower back and abdominal pain.  (R. 317-19).  On September 27, 2012, Plaintiff had an MRI of the lumbar spine.  The MRI images were not clear, because Plaintiff "had a difficult time remaining motionless for th[e] study."  (R. 312).  The MRI, however, showed "[v]ery mild degenerative changes . . . causing neural foraminal stenosis without substantial spinal canal stenosis."  (R. 313).[1]

Plaintiff was referred to a neurosurgeon, Dr. Kaveh Khajavi, for further examination.  Dr. Khajavi examined Plaintiff on October 22, 2012, for reported symptoms of lower leg pain and back pain.  (R. 309).  Dr. Khajavi's notes state:

_____

[1]     Spinal stenosis is a narrowing of the spine, which puts pressure on nerves and the spinal column and can cause pain.  ([12.7] at 4 n.1).

"MRI of the lumbar spine is completely normal.  At this point I do not know the etiology of her back or leg symptoms but they do not have a spinal etiology as again her MRI is completely normal."  (R. 309).  Dr. Khajavi noted that Plaintiff's pain "could be consistent with a hip pathology."  (R. 309).  It was recommended that Plaintiff consider seeing an orthopedist.  (R. 309).

On October 30, 2012, Plaintiff saw Dr. Fred Koch, an orthopedist.  Dr. Koch's exam noted that Plaintiff complained of pain in her back and legs. (R. 342).  Dr. Koch observed that the previous MRI showed "disk bulging but no major obvious neurologic compressive lesion."  (R. 342).  He recommended rehabilitation, medication, and—if the pain did not improve—epidural injections or some other type of pain management.  (R. 342).  On November 19, 2012, Plaintiff followed up with Dr. Koch, who noted that Plaintiff "is not making a lot of headway" through rehabilitation services.  (R. 341).  Dr. Koch recommended an evaluation by a pain specialist.  (R. 341).

On January 3, 2013, Plaintiff was treated by Dr. David A. Stewart, and received an epidural steroid injection ("ESI") to treat her pain.  (R. 363-64). Dr. Stewart's impression was lumbar radiculopathy.[2]  On January 25, 2013,

_____

[2]     Lumbar radiculopathy is pain in the lower back region radiating from damaged nerve roots.  80% to 90% of patients recover from it without surgery.

Plaintiff received a second ESI from Dr. Stewart, and she reported the first ESI decreased her pain by 60%.  (R. 361-62).

On February 20, 2013, Plaintiff applied for LTD benefits.  (R. 126).  When she applied, Plaintiff only identified Dr. Stewart as her treating physician. (R. 129).  On February 26, 2013, Defendant sent Plaintiff correspondence acknowledging Plaintiff's telephonic report of her claim and stating:  "We must obtain eligibility information from your employer and your physician's treatment plan, as well as medical information regarding your diagnosis and functional abilities."  (R. 196).

On March 4, 2013, Plaintiff returned to Dr. Stewart, explaining that when she stands for long periods of time she experiences pain and discomfort.  (R. 359). His impression was that Plaintiff might suffer from lumbar spondylosis and lumbar degenerative disease.  (R. 359).[3]  He recommended Plaintiff see a chiropractor. (R. 359).

---

American Association of Neuromuscular & Electrodiagnostic Medicine, http://www.aanem.org/Patients/Disorders/Lumbar-Radiculopathy.

[3]     Lumbar spondylosis describes bony overgrowths that can occur in the vertebrae.  "Lumbar spondylosis usually produces no symptoms.  When back or sciatic pains are symptoms, lumbar spondylosis is usually an unrelated finding." Medscape, http://emedicine.medscape.com/article/249036-overview.

Degenerative disc disease in the lumbar spine, or lower back, refers to a syndrome in which a compromised disc causes back pain.  It usually results from a

On March 22, 2013, Defendant sent a letter to Plaintiff stating: "Please understand that we need [medical records from Dr. Stewart] to determine your functional ability, and whether you qualify for benefits as defined under your policy." (R. 183). On April 8, 2013, Plaintiff's medical records from Dr. Stewart were faxed to Defendant. The same day, Dr. Stewart submitted a Physical Ability Assessment ("PAA"), limiting Plaintiff to walking, lifting, and carrying 10 lbs to 0 - 1/3 day, climbing, balancing and stooping to 1/3 - 2/3 day, and kneeling, crouching, crawling and use of lower extremities to 0 - 1/3 day. (R. 357-58). The PAA did not limit Plaintiff's sitting, standing, reaching, fine manipulation, or grasping. (R. 357-58). On April 11, 2013, Plaintiff identified Dr. Koch as one of her treating physicians, but Defendant was unsuccessful in obtaining records from Dr. Koch's office. (R. 101-102).[4]

A claim manager and nurse case manager ("NCM") at Defendant reviewed Dr. Stewart's records and concluded that the restrictions and limitations in the

_____

lower energy injury to the disc that progresses over time. "[A]fer a patient reaches 60, some level of disc degeneration is a normal finding on an MRI scan, rather than the exception." Spine-Health, http://www.spine-health.com/conditions/degenerative-disc-disease/lumbar-degenerative-disc-disease-ddd.

[4]     It is unclear if Plaintiff identified Dr. Khajavi as one of her treating physicians.

PAA were not supported by the records, because Dr. Stewart's only abnormal finding was back tenderness, with no diagnostic tests, no decreased range of motion, strength sensation, reflexes and medical evidence to demonstrate functional loss. (R. 97-98). The NCM called and faxed Dr. Stewart to ask the basis for his conclusions and whether diagnostic tests were run prior to the ESIs. (R. 178-79). Dr. Stewart's office did not respond to this request for information. (R. 96, 178-79).

On April 17, 2013, Defendant's Associate Medical Director, Dr. Donald Minteer, reviewed Plaintiff's records and found that "[t]here are no quantifiable, objective clinical exam, clinical testing or imaging documentations to support a significant ongoing physical functional impairment which would preclude [Plaintiff] from resuming her own occupational duties into or beyond LTD BSD [benefit start date] of 3/16/13." (R. 93-94). On April 18, 2013, Defendant informed Plaintiff that her claim for LTD benefits was denied because the medical information provided did not support restrictions and limitations, and did not demonstrate a functional loss. (R. 175-77).

On April 25, 2013, Plaintiff again saw Dr. Stewart and reiterated her report of pain. Dr. Stewart noted that Plaintiff's epidural injections initially decreased her pain about 50%, but, at the examination, she reported that "the pain [wa]s back,

very disturbing, rated 8/10.  Any type of activity, movement [wa]s very painful for her."  (R. 256).  Dr. Stewart discussed surgical intervention, but Plaintiff did not, at that time, want to proceed with surgery.  (R. 256).  Beginning in May 2013, Plaintiff frequently went to her chiropractor, and often complained of pain. (R. 286-300).

    C.    Continuing Treatment and Appeal of LTD Benefits Denial

On May 10, 2013, Plaintiff appealed Defendant's decision to deny LTD benefits.  (R. 348).  As part of its review, Defendant collected medical records from Dr. Brown, Dr. Koch, Dr. Stewart,[5] Plaintiff's chiropractor,[6] and Plaintiff's new orthopedist, Dr. Chappuis.[7]

On June 12, 2013, Plaintiff saw Dr. Chappuis, whose examination noted 5/5 motor strength in lower extremities with exception of 4/5 in left foot, minimal pain with range of motion upon flexion and extension, and normal gait.  (R. 226). Dr. Chappuis also noted dysesthesia to left foot, sensitivity to light touch, and positive straight leg raise for left leg.  (R. 226).  Dr. Chappuis ordered a new MRI,

---

[5]    Dr. Stewart is an anesthesiologist and pain physician.  It does not appear that he is a surgeon and the record does not disclose the surgery he recommended.

[6]    Dr. David Futral.

[7]    The record does not discuss whether Plaintiff identified Dr. Chappuis as a treating physician before Defendant made a decision on her claim on April 17, 2013.

which was performed on June 24, 2013.  The MRI showed minor bulges in some

disc spaces but, overall, showed "reasonable disc heights with shallow disc bulges

as above.  No levels of canal or foramina stenosis."  (R. 231).  On June 13, 2013,

Plaintiff's original treating orthopedist, Dr. Koch, circled "NO" to the question

"Are you certifying disability" for Plaintiff.  (R. 345).  Dr. Koch listed

10/30/12 - 12/10/12 as the dates for which he declined to certify disability.

(R. 345).

Dr. Chappuis referred Plaintiff to Dr. Armin Oskouei, another physician, for

pain management.  In June 27, 2013, Plaintiff saw Dr. Oskouei, who noted a

normal alignment and range of motion, 5/5 motor for lower extremities, and

normal alignment and normal full range of motion with extension, flexion, lateral

rotation and lateral bending for the spine.  (R. 235-37).  The examination also

noted a positive straight leg raise for the left leg and back tenderness.  (R. 235-37).

Dr. Oskouei's impession was left SI joint dysfunction versus lumbar radiculopathy,

lumbar facet syndrome, and cervical strain.  (R. 236).

On July 1, 2013, Plaintiff's chiropractor submitted a PAA limiting Plaintiff

to exerting ten pounds of force 0 - 1/3 of the day.  (R. 284).

On July 8, 2013, Dr. Chappuis submitted a PAA limiting Plaintiff to, at

most, lifting, pushing, and pulling 20 pounds occasionally, in addition to other

limitations. (R. 244). Dr. Chappius's diagnosis on the PAA was "Lumbar disc herniation L2-S1." (R. 263).

On July 9, 2013, Dr. Stewart submitted a PAA limiting Plaintiff to pushing and pulling a maximum of 20 pounds. (R. 268-69). Dr. Stewart's PAA did not include a diagnosis. (R. 268-69). Dr. Stewart also submitted an "All Systems Form," which noted some restricted range of motion, weakness in the left leg, and which described Plaintiff's gait and station as "left leg pain weakness." (R. 271-74).

On August 27, 2013, Defendant's Associate Medical Director Dr. Nick Ghaphery reviewed Plaintiff's records and opined that the limitations placed on Plaintiff by her treating physicians were not supported by clinical findings. (R. 46-48). Dr. Ghaphery's notes reference "med occ" and "medium occ," (R. 45), which Defendant interprets as "medium occupation." ([12.7] at 11-12).

On August 28, 2013, Defendant wrote to Plaintiff informing her it upheld its denial of LTD benefits ("Denial Letter"). (R. 136-38). The Denial Letter stated: "Although, Drs. Brown, Koch, Chappuis, Futral[8] and Stewart have provided restrictions and limitations that would prevent you from working; review of the

---

8        Plaintiff's chiropractor.

medical information on file does not demonstrate a functional loss or severe impairment that precluded you from performing the material duties of your own occupation as defined in the above Definition of Disability/Disabled." (R. 137). The Denial Letter noted that Plaintiff's MRIs showed only "Mild degenerative changes without any evidence of significant neural compression or central canal stenosis." (R. 137-38).

The Denial Letter erroneously stated Plaintiff's occupation required "Sedentary demand activities according to the Dictionary of Occupational Titles." (R. 136). The letter defined Sedentary as follows:

> Exerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are Sedentary if walking and standing are required only occasionally and all other Sedentary criteria are met.

(R. 137). Plaintiff's occupation is a medium level occupation that requires exerting up to 20 to 50 pounds of force occasionally, or 10 to 25 pounds of force frequently, or greater than negligible up to 10 pounds of force constantly to move objects. (R. 177).

D.    Procedural History

On March 3, 2015, Plaintiff filed her Complaint [1], seeking review, under the ERISA, of Defendant's denial of LTD benefits, and attorneys' fees. On

May 11, 2016, Defendant filed its Motion.  Defendant argues that its decision to deny LTD benefits was correct, and that, even if it was wrong, there was a reasonable basis for the denial.  Defendant argues the MRIs were the only objective diagnostic tests performed on Plaintiff, and the results of the MRIs did not support her treating physicians' limitation opinions.

On June 10, 2016, Plaintiff filed her Response [14.1].  Plaintiff argues that she was not required to submit objective medical evidence to prove disability. Plaintiff argues that, to the extent objective medical evidence is required, Defendant ignores the opinion of Dr. Chappuis, who opined that Plaintiff's MRI showed herniations.  Plaintiff argues that Defendant's LTD benefits denial decision was unreasonable because the proper inquiry is not whether Plaintiff presented objective evidence of pain, but whether there are consistent diagnoses of chronic pain and consistent observations of physical manifestations of pain by the claimant's doctors.

## II.     DISCUSSION

### A.     ERISA Standard

Plaintiff first objects to Defendant's filing of the Motion under Rule 52 of the Federal Rules of Civil Procedure.  Plaintiff "recognizes that the Eleventh Circuit has suggested that the use of Rule 52 may be proper in ERISA cases[,]" but

contends that Defendant "has not followed the correct method to have this Court decide this case 'on the administrative record[,]'" because the use of Rule 52 requires the consent of both parties.  ([14.1] at 1-2).

The "standard of review [in the ERISA context] does not neatly fit under either Rule 52 or Rule 56 [of the Federal Rules of Civil Procedure], but is a specially fashioned rule designed to carry out Congress's intent under ERISA." Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 618 (6th Cir. 1998). ERISA benefits denial cases place the district court as more of "an appellate tribunal than as a trial court."  See Curran v. Kemper Nat. Servs., Inc., No. 04-14097, 2005 WL 894840, at * 7 (11th Cir. 2005) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002)).  The court "does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  Id.; see also Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011) (review of a plan administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision).  Thus, there "may indeed be unresolved factual issues evident in the administrative record, but unless the administrator's decision was wrong, or arbitrary and capricious, these issues

will not preclude summary judgment as they normally would." <u>Pinto v. Aetna Life Ins. Co.</u>, No. 09-01893, 2011 WL 536443, at *8 (M.D. Fla. Feb. 15, 2011).

In the ERISA context, motions under Rule 52 or under Rule 56 "are nothing more than vehicles for teeing up ERISA cases for decision on the administrative record." <u>See</u> <u>Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.</u>, 813 F.3d 420, 425 n.2 (1st Cir. 2016); <u>see also</u> <u>Al-Abbas v. Metropolitan Life Ins. Co.</u>, 52 F. Supp. 3d 288, 294-96 (D. Mass. 2014) (on review of denial of ERISA benefits, where defendant moved for judgment on administrative record and plaintiff cross-moved for summary judgment, court considered the record in light of the parties' briefing to determine whether administrator's decision was reasonable). Thus, regardless of the specific vehicle chosen, the standard of review—which requires the Court to review the administrative record—remains the same. Under these procedural interpretations, the Court proceeds with its review of the administrative record.[9]

---

[9]    To the extent a Rule 52 Motion in the ERISA context requires consent, Plaintiff agreed in the Joint Preliminary Report and Discovery Plan that this action "is an action for review on the administrative record." ([9] at 6). Neither party seeks to introduce additional evidence, and the parties have agreed on what constitutes the administrative record.

The Eleventh Circuit has provided a six-step analysis (the "Williams[10] analysis") to guide district courts to review an ERISA plan administrator's decision:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong"; if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision is in fact "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Smith v. Pension Comm. of Johnson & Johnson, 470 F. App'x 864, 866-67 (11th Cir. 2012) (citing Blankenship, 644 F.3d at 1355).

---

[10]    Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132 (11th Cir. 2004).

Under the first step, a decision is "wrong" if "the court disagrees with the administrator's decision." Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1138 n. 8 (11th Cir. 2004) (overruled on other grounds). The Court applies the terms of the plan to determine whether the administrator was "wrong" in denying benefits to the claimant. Brannon v. BellSouth Telecomms., Inc., 318 F. App'x 767, 769 (11th Cir. 2009).

At step three, when conducting a review of an ERISA benefits denial under the arbitrary and capricious standard, the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made. Jett v. Blue Cross & Blue Shield of Ala., 890 F.2d 1137, 1139 (11th Cir. 1989). Even if the benefit determination is *de novo* wrong, the role of the court is limited to an inquiry into whether there were "reasonable" grounds to support it. Williams, 373 F.3d at 1138. The Court thus limits its review to whether the plan administrator's benefits determination "was made rationally and in good faith—not whether it was right." Griffis v. Delta Family-Care Disability, 723 F.2d 822, 825 (11th Cir. 1984). "The reviewing court will affirm merely if the administrator's decision is reasonable given the available evidence, even though the reviewing court might not have made the same decision if it had been the original decision-maker."

Burden v. Reliastar Life Ins. Co., No. 1:12-CV-04392-WSD, 2014 WL 26090, at *5 (N.D. Ga. Jan. 2, 2014) (alterations omitted) (quoting Callough v. E.I. du Pont de Nemours & Co., 941 F. Supp. 1223, 1228 n.3 (N.D. Ga. 1996)).

A "reviewing court must take into account an administrative conflict when determining whether an administrator's decision was arbitrary and capricious, [but] the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." Doyle v. Liberty Life Assur. Co. of Boston, 542 F.3d 1352, 1360 (11th Cir. 2008).

    B.    Analysis

        1.    Review of Defendant's Decision to Deny Benefits

The Court first conducts its *de novo* review to determine whether Defendant's decision to deny benefits was wrong. The *de novo* review requires the Court to apply the terms of the plan to determine whether the administrator was "wrong" in denying benefits to the claimant. Brannon, 318 F. App'x at 769.

The Group Policy provides:

**Disability Benefits**
The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. . . .  He or she must provide the Insurance Company, at his or her expense, satisfactory proof of Disability before benefits will be paid.

(R. 14).  The Group Policy defines "disability" as follows:

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
>
> 1. unable to perform the material duties of his or her Regular Occupation and
>
> 2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.
>
> After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
>
> 1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
>
> 2. unable to earn 60% or more of his or her Indexed Earnings.

(R. 9).

The crux of the parties' dispute is whether Plaintiff submitted "satisfactory proof" that she was disabled, that is, that she was unable to perform the material duties of her regular occupation.  Defendant argues that the "only objective diagnostic tests performed on Plaintiff were two MRIs[,]" which Defendant contends did not show conditions sufficient to support a finding that Plaintiff was disabled.  (Mot. at 18-19).  In support of its argument, Defendant relies on Watts v. BellSouth Telecomms., Inc., 218 F. App'x 854, 856 (11th Cir. 2007).  In Watts, the Eleventh Circuit stated that where "the plan puts the burden on the

claimant to prove that she is disabled, it is implicit in the requirement of proof that the evidence be objective." (citing, *inter alia*, Brucks v. Coca-Cola Co., 391 F. Supp. 2d 1193, 1205 (N.D. Ga. 2005)).

The Eleventh Circuit also has recognized that "pain-related disabilities, such as fibromyalgia or chronic pain syndrome . . . [may not be] subject to diagnosis by 'objective' laboratory tests." Oliver v. Coca Cola Co., 497 F.3d 1181, 1195 (11th Cir. 2007), reh'g granted and partially vacated on other grounds, 506 F.3d 1316 (11th Cir. 2007); see also Lee v. BellSouth Telecomms., Inc., 318 F. App'x 829, 837 (11th Cir. 2009) ("[t]here is, quite simply, no laboratory dipstick test to diagnose chronic pain syndrome."); Mitchell v. Eastman Kodak Co., 113 F.3d 433, 443 (3d Cir. 1997) ("It is now widely recognized in the medical and legal communities that there is no dipstick laboratory test for chronic fatigue syndrome . . . .  [Because the disease] has no known etiology, it would defeat the legitimate expectations of participants . . . to require those with CFS to make a showing of clinical evidence of such etiology as a condition of eligibility for LTD benefits.").  In cases of pain-related disabilities,

> much medical evidence, especially as it relates to pain, is inherently "subjective" in that it cannot be quantifiably measured.  Indeed, the only evidence of a qualifying disability may sometimes be the sort of evidence that [defendants] characterize as "subjective," such as physical examinations and medical reports by physicians, as well as the patient's own reports of [her] symptoms.

Id. at 1196.  That is, in addition to objective evidence, physical examinations and medical reports by physicians, "[a] plaintiff's subjective reports of pain . . . should be considered in light of any objective physical findings that are available and other indications of credibility."  Babb v. Metropolitan Life Ins. Co., No. 5:06-cv-281 (CAR), 2008 WL 4426059, at *6 (M.D. Ga. Sept. 25, 2008).

Here, the medical evidence shows Plaintiff reported some degree of pain that impacted her ability to perform the functions of her job.  For example, Plaintiff's chiropractor submitted a PAA limiting Plaintiff to exerting ten pounds of force 0 - 1/3 of the day.  (R. 284).  Dr. Chappuis submitted a PAA limiting Plaintiff to, at most, lifting, pushing, and pulling 20 pounds occasionally, in addition to other limitations.  (R. 244).  Dr. Stewart submitted two PAAs, one limiting Plaintiff to walking, lifting, and carrying 10 lbs to 0 - 1/3 day, climbing, balancing and stooping to 1/3 - 2/3 day, and kneeling, crouching, crawling and use of lower extremities to 0 - 1/3 day, and the other limiting Plaintiff to pushing and pulling a maximum of 20 pounds.  (R. 268-69, 357-58).  Plaintiff's reports of pain escalated after Plaintiff was denied benefits on the medical records then available.  She saw a chiropractor, engaged in physical therapy, received two ESIs, and was treated by numerous specialists to treat her pain.  (See, e.g., R. 359, 341-42, 309, 325, 256, 286-300, 361-62).  But physical examinations conducted by Drs. Brown, Khajavi,

Koch, Stewart, Chappuis, and Oskouei, and the MRIs, did not support Plaintiff's subjective reports of pain and the limitations resulting from it. There also is no physician that suggests Plaintiff suffers from chronic pain syndrome or any other condition without an etiological basis. The evidence rather is that the treating physicians, based on the objective evidence, perceive there is an etiological basis for the pain Plaintiff claims, including that the pain might be remedied by surgery that the Plaintiff has declined.

Plaintiff's treating physicians did not agree upon or conclusively identify a cause, or etiology, of Plaintiff's pain except ordinary age-related physical conditions and pain associated with age-related physical changes routinely experienced by people. In the case of Dr. Koch, on June 13, 2013, he circled "NO" to the question "Are you certifying disability" for Plaintiff. (R. 345). Dr. Koch listed 10/30/12 - 12/10/12 as the dates for which he declined to certify disability. (R. 345). One district court has noted that "[a] physician's ability to make the correct diagnosis or properly isolate and classify an ailment, though important among medical practitioners and vital to proper treatment, has no real bearing on whether someone is in fact injured or disabled." Meinke v. Comput. Sci. Corp., No. 302CV286, 2004 WL 5345274, at *11 (S.D. Ohio Sept. 20, 2004). "Rightly or wrongly diagnosed, a patient's condition is what it is, and if it is disabling, it

matters little for purposes of ERISA LTD benefits what the medical term for it is."
Id.  While this observation is a bit hyperbolic, it is based on the reality in
pain-based disabilities that it is the combination of all the objective and subjective
evidence, the findings of physicians and the reports of claimants, upon which a
plan administrator must determine, based on the record, if there exists a disability
covered by a plan.  That is the question here.

In this case, the Dictionary of Occupational Titles requires Plaintiff to be
able to perform medium duties.  There are a variety of administrative record entries
that support that the disability determination made by Defendant was based on this
medium duty standard.  (See R. 45-46).  The Denial Letter, however, supports that
the lesser "sedentary" duty standard was applied.  Based on this contradiction, this
matter must, at least, be remanded for Defendant to evaluate the evidence provided
and apply the medium duty standard that the parties agree must be applied here.

It is only with the applicable standard properly applied, considering
objective and subjective evidence, that the Court can conduct the review required
by Williams.  The Court notes further that in the event it is determined that
Plaintiff cannot perform her regular occupation because of a disability, a
determination should be made, and, if necessary, a record developed, whether the
disability found renders Plaintiff unable to perform the material duties of any

occupation for which Plaintiff is or may reasonably become qualified based on education, training and experience, and the accompanying factors set out in the definition of "disability" under the Plan.

## III.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Life Insurance Company of North America's Motion for Judgment on the Administrative Record [12] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that this case is **REMANDED** to review Plaintiff's claim under the "medium occupation" standard, and, if necessary, the "any occupation" standard in the definition of disability under the Plan.

**SO ORDERED** this 28th day of November, 2016.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE